IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSE BENNETT, et al.,<br><br>Defendants. | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br>Case No. 1:21-CR-59-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant Jesse Bennett's Motion to Suppress Evidence [ECF No. 60]. On September 2, 2021, the court held an evidentiary hearing on the motion, and on November 8, 2021, the court heard closing arguments. At the hearings, Defendant appeared and was represented by R. Blake Hamilton, and the United States was represented by Aaron Flater. The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the memoranda and arguments submitted by the parties, and the law and facts relating to the motion. Now being fully advised, the court issues the following Findings of Fact, Conclusions of Law, and Memorandum Decision and Order on Defendant's Motion to Suppress Evidence.

**FINDINGS OF FACT**

On March 19, 2021, Officer Robert Palmer, with the Logan City Police Department, conducted a traffic stop of Defendant Jesse Bennett. At the time, Officer Palmer knew that Bennett was involved with an active investigation being pursued by other members of the Logan

City Police Department who were a part of the Drug Task Force into drug activity at Christopher Vail's residence in Logan, Utah. Officer Palmer also knew that Bennett had been going to Vail's house at times that were unsanctioned by the task force.

On March 19, 2021, Sergeant William Barber, a member of the drug task force, called Officer Palmer and asked him to conduct a traffic stop of a red/maroon SUV[1] with Idaho license plates that had just left Vail's residence. Sergeant Barber told Officer Palmer that while he was doing surveillance of Vail's residence, he saw a male matching Bennett's description arrive at and leave Vail's home in the SUV and that he had seen Bennett in that SUV at Vail's home earlier in the week. Sergeant Barber asked Officer Palmer to conduct a traffic stop of the SUV if he could. Officer Palmer followed the SUV for a short distance near Center Street but he stopped following it because he did not see a traffic violation.

Although he stopped following the vehicle, Officer Palmer continued listening to the police radio communications of the members of the drug task force, who had been conducting the surveillance. A short time later, they identified the location of the SUV and Officer Palmer realized he was only a short distance from the vehicle. Because he was not far from that location, he began following the vehicle again. Officer Palmer confirmed with the task force on the radio that he was following the right vehicle. Sergeant Barber testified that the task force had not lost visual of the SUV from when it left Vail's house. After following the SUV again for a few minutes, Officer Palmer saw a driver's side tire on the SUV cross the double-yellow center line.

Officer Palmer had a dash camera on his vehicle that videorecorded Bennett's SUV. Officer Palmer testified that the violation occurred between the 30 and 40 second time stamp on

---

[1] Officer Palmer testified that the SUV was red, but Sergeant Barber testified that the SUV was maroon. However, other testimony by the officers made clear that the officers were referring to the same vehicle.

the recording. On cross examination, Officer Palmer was asked to stop the video when he thought it showed the violation. He asked for the recording to be stopped at the 34.869 second mark. It appeared to the court that Officer Palmer was correct that a tire on the SUV crossed the double line. Officer Palmer also testified that he could see the violation more clearly in person that night than it is depicted on the video. The court found this testimony credible.

Officer Palmer testified that he has a history of pulling drivers over who cross the center line and that it is a valid reason for pulling someone over. He also noted that he is more likely to pull someone over for the violation at night, like he did with Bennett, because of possible impairment.

When Officer Palmer spoke to Bennett, the driver of the SUV, he stated that the vehicle had crossed into the yellow line, not over the yellow line. Bennett asserts that this is definitive of whether the tire crossed the line, but Officer Palmer must have misspoken. Officer Palmer testified that he believed part of the tire had crossed the line into the oncoming lane and that a violation occurs when a tire crosses over the line and into the other lane, not just into the line.

At a point in the stop when Officer Palmer was back in his car, he told an officer who approached his window that the driver was Jesse Bennett and to let "Bill" know, referring to Sergeant Barber. Sergeant Barber arrived at the traffic stop. A canine had indicated on the SUV by that time, so Sergeant Barber told Officer Palmer to take Bennett into custody and search him. Officer Palmer did so and turned things over to the task force.

Sergeant Barber testified that the task force began an investigation of Vail at the end of 2020 because they had received evidence from informants that Vail was selling drugs. The task force did surveillance of Vail's residence in February and March 2021 and observed a lot of short-term traffic. During this time frame, the task force also got a call from the Preston, Idaho

3

police department about Jesse Bennett.  Bennett had been arrested in Preston with one pound of methamphetamine and he told the officers that he got it in Logan, Utah, from Christopher Vail.

Sergeant Barber met with Bennett in February 2021 and talked to him about being a confidential informant.  However, during their surveillance of Vail's residence, they saw Bennett going to the house at times that the task force had not sanctioned.  Sergeant Barber stated that it looked like Bennett was buying drugs from Vail like he had done in the past.  The task force had seen Bennett in a red Jeep, a silver SUV, and a maroon SUV.  The task force officers wanted Officer Palmer to pull over Bennett on the night in question for a traffic violation so the investigation into Vail and his other associates would not be compromised.  The officers did not want Vail and/or his associates to learn of their surveillance.

There are no specific police reports regarding the surveillance of Vail's house on the night in question.  Sergeant Barber testified that he thought one of the junior officers had done a report and that he should have done his own supplemental report but did not.  While Bennett questions whether the task force did surveillance that night, the officers clearly recalled the events of the night, testified consistently, and their testimony was consistent with the other evidence.  The officers appeared to the court to be credible witnesses and there is no evidence that would call the veracity of their testimony into question.

Bennett called Dr. Jay Pryzbyla as an expert witness.  Dr. Pryzbyla conducted a comprehensive mathematical analysis of whether the SUV's tire crossed the double line.  He concluded through his calculations that the SUV did not cross over the double yellow line.  The United States did not cross examine Dr. Pryzbyla, stating that it would rely on the video evidence to the extent that the traffic violation was relevant and noting that the court did not need to find beyond a reasonable doubt that the vehicle had crossed the line.  The court has some concerns

about the accuracy of Mr. Pryzbyla's calculations. And given that the relevant legal standard requires the court to determine whether the officer acted "objectively reasonable," the court also believes it is more appropriate to rely on what the video appears to show and the officer's testimony of what he believes he saw than determine whether Dr. Pryzbyla's calculations are correct.

## CONCLUSIONS OF LAW

### I. Traffic Violation

The court concludes that Officer's Palmer stop of Bennett's vehicle was justified because Officer Palmer saw what he believed to be a traffic violation. "[T]he government need not show a violation actually occurred to justify an initial traffic stop. An initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred." *United States v.* Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

The court does not need to determine whether, in fact, the SUV crossed the double yellow line. Even if Officer Palmer erroneously believed that the SUV crossed the double line, it does not make the stop unlawful. "That an officer's suspicions may prove unfounded does not vitiate the lawfulness of a stop, provided the officer's error was made in good faith and is objectively reasonable under the circumstances. Police errors, in this context, are simply unavoidable as reasonable suspicion involves 'probabilities' rather than 'hard certainties.'" *Untied States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). "An officer's reasonable mistake of fact does not a constitutional violation make. '[W]hat is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable.'" *United States v. Cunningham*, 630

F. App'x 873, 876 (10th Cir. 2015). "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or law—must be objectively reasonable." *Heien v. North Carolina*, 574 U.S. 54, 66 (2014).

In this case, the court concludes that the video and Officer Palmer's testimony demonstrates that Officer Palmer had an objectively reasonable belief that a traffic violation had occurred when he pulled over Bennett's SUV. The court need not engage in mathematical certainty that the SUV crossed the line when the court can review the video and assess Officer Palmer's credibility. Officer Palmer testified that he saw a tire on the SUV cross the double yellow line. On the video, it appears to the court that the tire crossed the line. Even if two people could view it differently, it does not demonstrate that Officer Palmer's actions were objectively unreasonable. Although the court recognizes that it is very close, Officer Palmer testified that he could see the violation more clearly that night than it appears on the video because of lighting and the quality of the video. The court finds this testimony credible. Officer Palmer's testimony of the events of that night indicates that he was not willing to pull over Bennett for a fabricated reason. He testified that when he first followed the SUV, he did not observe a traffic violation and stopped following it. This behavior makes his later decision to stop the SUV for crossing the line more credible. Because the court concludes that Officer Palmer reasonably pulled over Bennett's SUV for a traffic violation, the court concludes that there are no grounds for suppressing the evidence.

## II.     Collective Knowledge Doctrine

The United States also argues that Officer Palmer's stop was legally justified under the collective knowledge doctrine. "'Under the collective knowledge doctrine, the officer who makes the stop or conducts a search need not have reasonable suspicion or probable cause.' . . .

'Instead, the reasonable suspicion or probable cause of one officer can be imputed to the acting officer.'" *United States v. Latorre*, 893 F.3d 744, 753 (10th Cir. 2018) (quoting *United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017)). "'Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action.'" *Id.* (quoting *Untied States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012)); *see also United States v. Hensley*, 469 U.S. 221, 231 (1985)).

In this case, Sergeant Barber had probable cause to believe that Bennett was engaged in criminal activity. On the night in question, Sergeant Barber saw a man matching Bennett's description, in a vehicle he had seen Bennett in earlier that week, come and go from Vail's residence. The task force had not authorized Bennett to make a controlled purchase that night. This was not a new occurrence. During the previous surveillance of Vail's house, Sergeant Barber saw Bennett come and go from the house without authorization from the task force. Bennett had previously admitted to officers that he had been purchasing methamphetamine from Vail every few days. Sergeant Barber believed that Bennett was back to doing what he had done before. Sergeant Barber had reason to suspect that these unauthorized visits involved continuing drug transactions. When Sergeant Barber asked Officer Palmer to pull over Bennett, Officer Palmer could rely on Sergeant Barber's reasonable suspicion.

Bennett questions whether Barber or the task force were actually conducting surveillance of Vail's residence that night. But Barber's recollection of the night was clear and credible and consistent with the other evidence. It was also credible to the court that Sergeant Barber did not write a report of the surveillance because he thought junior officers would do so. Bennett further asserts that Officer Palmer cannot rely on the information from Sergeant Barber because he did

not include it in his report. However, the officers testified that they did not want to include the information because it could compromise the ongoing investigation into Vail's drug trafficking activities. The officers did not want Vail or his associates to learn of their investigation. Bennett claims that there was no need to keep the investigation secret because he already knew of the investigation. But the officers would have no reason to believe that someone who agreed to be a confidential informant would tell the organization what he was doing. Therefore, the investigation would still be a secret to the main targets of the investigation.

Based on Sergeant Barber's reasonable suspicion, the court concludes that Officer Palmer's stop was also legally justified under the collective knowledge doctrine.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, Defendant Jesse Bennett's Motion to Suppress Evidence [ECF No. 60] is DENIED.

DATED this 18th day of November, 2021.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge